FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: ___Mar 11 2024___

**KEVIN P. WEIMER** , Clerk

By: s/Kari Butler
_____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION FILE NO. |
| ETHAN WEATHERS, | 4:23-CR-00031-WMR-WEJ-1 |
| Defendant. | |

## NON-FINAL REPORT AND RECOMMENDATION

The grand jury indicted defendant, Ethan Weathers, on two counts of unlawful firearm possession.  (Indict [1].)  The indictment charges Mr. Weathers with knowingly possessing a firearm after having been committed to a mental institution in violation of 18 U.S.C. § 922(g)(4) (id. Count I) and while under indictment for a felony in violation of 18 U.S.C. § 922(n) (id. Count II).  This case is before the Court on defendant's Motion to Dismiss the Indictment.  (Def.'s Mot. [15].)  Mr. Weathers claims that he was neither committed to a mental institution nor under indictment at the time, and that the statutes underlying the charges are unconstitutional under the Second Amendment to the United States Constitution.

(Id. at 1-2.)  For the reasons that follow, the undersigned **RECOMMENDS** that defendant's Motion [15] be **DENIED**.

## I.   BACKGROUND

Law enforcement officers discovered Mr. Weathers in possession of a firearm on August 16, 2021 after pulling his car over in Polk County, Georgia.  On October 24, 2023, the grand jury charged Mr. Weathers with knowingly possessing a firearm (a Glock 45 9mm pistol) on or about August 16, 2021, knowing that the State Court of Cobb County, Georgia had previously committed him to a mental institution, in violation of 18 U.S.C. §§ 922(g)(4) and 924(a)(8).  (Indict. Count I.) The grand jury also charged Mr. Weathers with knowingly receiving a firearm on August 16, 2021 while under a December 2, 2020 indictment in the Superior Court of Cobb County, Georgia for aggravated assault and false imprisonment, each punishable by over a year in prison, in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D).  (Id. Count II.)

Mr. Weathers filed a Motion for a Bill of Particulars [14] on both Counts and the instant Motion to Dismiss Indictment [15] one day before this case's pretrial

conference.[1]  In the former Motion, Mr. Weathers asked the Court to order the Government to provide information concerning his alleged commitment to a mental institution and state court indictment.  (Def.'s Mot. for Bill of Particulars [14] 3-4.)  In the latter, Mr. Weathers seeks to dismiss both Counts, asserting that he was never committed to a mental institution and that he was not under indictment on August 16, 2021.  (Def.'s Mot. [15] 1.)  The Motion also challenges the constitutionality of 18 U.S.C. §§ 922(g)(4) and 922(n).  (Id. at 2.)

The Court granted the Motion for a Bill of Particulars at the pretrial conference, and took the other Motions under advisement.  (Order of Dec. 15, 2023 [16].)  In response to the Court's Order, the Government claims that the Cobb County State Court revoked defendant's probation on March 14, 2019 and ordered the sheriff's office to transport him to a treatment facility, where the court ordered him to remain until he successfully completed a mental health and substance abuse treatment program.  (Bill of Particulars [17] 1-2.)  The Government also claims that Mr. Weathers was under a December 2, 2020 indictment in the Cobb County

---

[1] Mr. Weathers also filed a Motion to Suppress Statements [12] and a Motion to Suppress Evidence [13].  Those Motions are not yet ripe for review.

3

Superior Court, pled guilty to those charges, and was serving a sentence under the Georgia First Offender Act when he was arrested on August 16, 2021.  (Id. at 2.)

The Government reiterated these allegations and defended the constitutionality of the firearm restrictions in its Response [18] to defendant's Motion to Dismiss.  Mr. Weathers filed a Reply Brief [19] in support of his Motion, along with several exhibits [19-1 through 19-5].

## II.   DISCUSSION

Mr. Weathers offers four reasons why the Court should dismiss the indictment.  He argues that Count I should be dismissed because he was not "committed" to a mental institution as alleged in the indictment, and because Section 922(g)(4) is unconstitutional under the Second Amendment and the Supreme Court's holding in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022).  Mr. Weathers also argues that Count II should be dismissed because he was not "under indictment" on August 16, 2021, and because Section 922(n) is unconstitutional under Bruen.  The undersigned first reviews defendant's factual challenges and concludes that they are inappropriate grounds for dismissal.  The undersigned then addresses defendant's constitutional challenges and finds them

unsupported under Eleventh Circuit precedent, and that the Government has satisfied its burden under <u>Bruen</u> in any event.

## A.  <u>Defendant's Factual Challenges</u>

### 1.  Commitment to a Mental Institution

"The sufficiency of a criminal indictment is determined from its face." <u>United States v. Salman</u>, 378 F.3d. 1266, 1268 (11th Cir. 2004) (quoting <u>United States v. Critzer</u>, 951 F.2d 306, 307 (11th Cir. 1992) (per curiam)).  In order to avoid dismissal, the face of the indictment "must contain the elements of the offense intended to be charged, and sufficiently apprise the defendant of what he must be prepared to meet" in defending against the allegations.  <u>United States v. Sharpe</u>, 438 F.3d 1257, 1263 (11th Cir. 2006).  Here, Count I of the indictment alleges as follows:

> On or about August 16, 2021, in the Northern District of Georgia, the defendant, ETHAN WEATHERS, knowing that he had previously been committed to a mental institution by the State Court of Cobb County, Georgia, did knowingly possess, in and affecting interstate and foreign commerce, a firearm, that is, one (1) Glock 9mm, model 45, pistol, in violation of Title 18, United States Code, Sections 922(g)(4) and 924(a)(8).

(Indict. Count I.)

Section 922(g)(4) makes it unlawful for "any person . . . who has been committed to a mental institution" or adjudicated mentally defective to "possess[,]"

5

in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(4).[2] In United States v. McIlwain, the Eleventh Circuit interpreted the word "commit" under Section 922(g)(4), and explained that it means "to place officially in confinement or custody" by a "lawful authority." 772 F.3d 688, 694 (11th Cir. 2014) (citing American Heritage College Dictionary 280 (3d ed. 1997) & 27 C.F.R. § 478.11). The Circuit also recognized that if a person is committed, he or she "is not voluntarily entering, but has been committed by a third party, and the commitment is not merely for observation." McIlwain, 772 F.3d at 694.

Count I sufficiently alleges the elements of a Section 922(g)(4) offense and grounds that, if true, support the charge. It alleges that Mr. Weathers knew he had previously been committed to a mental institution; that this commitment was ordered (not entering voluntary or for observation) by a court (a lawful authority / third party); that Mr. Weathers knew he possessed a firearm; and that it affected interstate commerce. In addition to the necessary elements of the crime, Count I alleges the date and venue of possession, the lawful authority that ordered commitment, and the type of firearm possessed. These allegations sufficiently

---

[2] Section 924(a)(8) provides that whoever "knowingly violates" this statute "shall be fined under this title, imprisoned for not more than 15 years, or both." 18 U.S.C. § 924(a)(8).

apprise Mr. Weathers of what he will face at trial.  Moreover, Count I "specifically refers to the statute on which the charge was based."  United States v. Wayerski, 624 F.3d 1342, 1349 (11th Cir. 2010) (quoting United States v. Fern, 155 F.3d 1318, 1325 (1998)).  This "reference to the statutory language adequately informs the defendant of the charge." Id. at 1349-50.  Therefore, Count I is sufficient on its face and should not be dismissed.

Mr. Weathers does not seriously dispute that Count I alleges the elements of a Section 922(g)(4) offense, or that it lacks sufficient information for him to tender a defense at trial.  Instead, Mr. Weathers tenders his defense to Count I now:  "Mr. Weathers challenges the facts underlying those claims."  (Def.'s Mot. 1.)  As outlined above, however, that is not the inquiry upon a motion to dismiss an indictment.  See Salman, 378 F.3d. at 1268; Sharpe, 438 F.3d at 1263; Wayerski, 624 F.3d at 1349-50.  Rather, the indictment need only inform Mr. Weathers of the crime he is charged of committing so that he may be "prepared to meet" the allegations at trial.  Sharpe, 438 F.3d at 1263.  At no point during this standard of review does the Court decide whether the allegations behind the charges are true or false.  Challenging the facts alleged by the Government is, of course, the point of holding a trial.  To resolve those facts here would effectively "require a trial of the

7

general issue of guilt or innocence" long before the Government presents its case. United States v. Farrier, No. 1:23-CR-212-TFM, 2024 WL 184451, at *3 (S.D. Ala. Jan. 17, 2024) (citations omitted).  Because such determinations "are the province of a jury," the Court must decline defendant's invitation to rule on his factual challenges.  Id.  Accordingly, the indictment should not be dismissed on this basis.

Although the instant objection need not be entertained beyond the face of the indictment, Salman, 378 F.3d. at 1268, the undersigned will address the facts Mr. Weathers introduces to provide a thorough report and recommendation.

According to Mr. Weathers, he "was never involuntarily committed to a mental institution."  (Def.'s Mot. 3.)  For its part, the Government argues that Mr. Weathers was convicted of violating the Georgia Controlled Substances Act, simple battery, simple assault, and obstruction in Cobb County, Georgia.  In its Response Brief and Bill of Particulars,[3] the Government provides an excerpt (but

---

[3] The sufficiency of an indictment is "not undermined by the filing of a more detailed bill of particulars."  United States v. Brantley, 461 F. App'x 849, 854 (11th Cir. 2012) (per curiam) (citing United States v. Haas, 583 F.2d 216, 221 (5th Cir. 1978) (concluding that bare allegations in an indictment are sufficient to withstand a motion to dismiss even when a bill of particulars is needed for the defendant to prepare a defense)); see also Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981).

not a copy) of an order from Cobb County State Court Judge Allison B. Salter, dated March 14, 2019. The order revokes Mr. Weathers's probation, directs the sheriff's office to take him to a treatment facility, and requires Mr. Weathers to complete the facility's treatment program:

> [T]he defendant shall be transported on Monday, March 18, 2019 from the Cobb County Adult Detention Center by the Cobb County Sheriff's Department to Skyland Residential Treatment Facility-Admissions Office located at 1961 North Druid Hills Rd. NE, Atlanta, GA 30329 (Dorothy C. Fuqua Building), and shall arrive at the facility no later than 10:00 a.m.; the defendant shall, upon arrival at the Admissions Office, be released from custody and reinstated to probation, and the remaining custody time is suspended upon immediate admission into the Skyland Trail Residential Treatment program which meets the requirements of the Substance Abuse/Mental Health evaluation dated December 24, 2018. It is further ordered that the defendant will remain in the facility for the clinically recommended length of the in-patient program and successfully complete said program . . . .

(Bill of Particulars 2; see also Gov't Resp. 2.)

The Government argues that this order shows that Mr. Weathers was involuntarily committed to a mental institution. In reply, Mr. Weathers claims that this order only tells part of the story. Mr. Weathers asks the Court to view his state proceedings as a whole, arguing that this will show that he sought mental health treatment voluntarily and, therefore, was not "committed" as required by Section 922(g)(4). (Def.'s Reply 4-8.)

9

Mr. Weathers claims that on October 3, 2018, he entered a negotiated guilty plea to four misdemeanor charges.  According to the deal, Mr. Weathers would serve 9 days of custody with roughly 3 years of probation.  Mr. Weathers subsequently violated the conditions of his probation, and the court ordered him to serve 8 months in the Cobb County Adult Detention Center.  While in jail, Mr. Weathers requested a hearing to modify his detention order through counsel.  Mr. Weathers claims that at the hearing, "the parties agreed" to allow him to submit to in-patient treatment instead of requiring him to serve 8 months in custody.  (Def.'s Reply 5.)  Mr. Weathers insists that he "could have chosen not to consent to this [treatment] and instead serve the 8 months" in detention.  (Id. at 6.)

In support of his claims, Mr. Weathers attached several documents from the state court proceedings, including a full copy of the March 14, 2019 order bearing the signatures of Judge Salter, the Assistant Solicitor General, and, notably, his counsel.  (Def.'s Reply Ex. 1 [19-1], at 1-3.)  Mr. Weathers concludes that this evidence shows that Judge Salter's probation revocation, which he refers to as a "modification" resulting from a hearing he requested, does not qualify as an involuntary commitment order because "he consented to it."  (Id. at 5.)  Mr. Weathers also contrasts these proceedings with those outlined in Georgia's

10

statutory scheme governing petitions for commitment.  (Id. at 6 (citing O.C.G.A. §§ 37-3-60 et seq.).)

This argument might find merit down the road,[4] but not in the present attempt to dismiss the indictment.  The grand jury cited Section 922(g)(4) and alleged that a state court committed Mr. Weathers to a mental institution.  (Indict. Count I.)  Put differently, the indictment alleges that a lawful authority ordered Mr. Weathers to complete mental health treatment beyond mere observation, as opposed to voluntary treatment.  See McIlwain, 772 F.3d at 694.  Mr. Weathers challenges these allegations, and offers additional context and evidence he argues undermine their veracity.  (Def.'s Mot. 1; Def.'s Reply 1-8 & Ex. 1.)  However,

---

[4] Although not at issue in McIlwain, as noted above, the Eleventh Circuit observed that a plain reading of the word "commitment" in Section 922(g)(4) means that "[t]he person is not voluntarily entering" mental health treatment, "but has been committed by a third party, and the commitment is not merely for observation."  772 F.3d at 694 (citations omitted).  Georgia's Controlled Substances Act appears to contemplate treatment somewhere in the middle of this definition.  It allows the court to order treatment beyond mere observation and permit "probation . . . preferably [with] terms which require the person to undergo a comprehensive rehabilitation program, including, if necessary, medical treatment."  O.C.G.A. § 16-13-2(a).  A court may enter such terms of probation "with the consent of such person."  Id.; (but see infra note 5.)  In this case, however, defendant's involuntary treatment is an element for the Government to prove at trial.  For now, it is sufficient that the indictment allege that Mr. Weathers had previously been committed to a mental institution.

11

because this challenge departs from the face of the indictment and goes directly to the merits, it cannot be considered on the instant Motion.  See Salman, 378 F.3d at 1269 ("We recognize that our system of criminal procedure may result in legally meritless cases being sent to trial, but absent further legislative direction, it is not for the courts to filter which criminal cases may reach the trial stage by reviewing the proffered evidence in advance.").

Mr. Weathers argues that his challenge is capable of pretrial determination because "the facts surrounding [the] commission of the alleged offense would be of no assistance in determining the validity of the motion." (Def.'s Mot. 2-3 (citing United States v. Turner, 842 F.3d 602, 604 (8th Cir. 2016); United States v. Harvey, 609 F. Supp. 3d 759, 768 (D. Neb. 2022) (ruling on a pretrial motion to dismiss Section 922(g)(4) indictment that the defendant had not been committed to a mental institution).)   But Mr. Weathers does the opposite here; he introduces facts surrounding the alleged offense to show he consented to treatment for the explicit purpose of validating his Motion.  And while Mr. Weathers points to some courts that might entertain his argument, the Eleventh Circuit has repeatedly—and sternly—warned against considering attacks such as this:  "A district court may not dismiss an indictment based on a determination of facts that should [be] developed

12

at trial," nor may it dismiss an indictment "for insufficient evidence" backing the allegations.  United States v. Baxter, 579 F. App'x 703, 705-06 (11th Cir. 2014) (per curiam) (citing Sharpe, 438 F.3d at 1263; Critzer, 951 F.2d at 307; Salman, 378 F.3d at 1268); see also Salman, 378 F.3d at 1265 (in assuming facts in dismissing the indictment, "the district court overlooked binding precedent from this court") (footnote omitted); United States v. Aydin, No. 1:12-CR-221-2-ODE, 2015 WL 927666, at *11 (N.D. Ga. Mar. 3, 2015) (observing that "the Eleventh Circuit has been strict about trial judges' dismissing indictments on sufficiency of the evidence prior to trial"); United States v. Blitch, No. CRIM.A.5:08-CR-40HL, 2008 WL 5115028, at *2 (M.D. Ga. Dec. 4, 2008) ("[T]he Eleventh Circuit has severely limited the right of a defendant to challenge pretrial the sufficiency of the indictment brought against him.").

In Baxter, for example, the grand jury indicted the defendant under Section 922(g)(1), the felon-in-possession provision, and alleged that he had three prior Alabama convictions for forgery.  579 F. App'x at 704.  Mr. Baxter moved to dismiss that count, arguing that he was not a convicted felon, and that the government could not prove otherwise.  Id.  The Eleventh Circuit found that by calling into question the validity of his prior convictions as alleged in the charge,

"Mr. Baxter's motion to dismiss the indictment impermissibly asked the district court to . . . look beyond the indictment." <u>Id.</u> at 706.  Likewise, by arguing that the government could not prove that he was a convicted felon under Alabama law, the motion impermissibly sought dismissal "for insufficient evidence." <u>Id.</u>  Although Mr. Baxter's challenge involved construction of Alabama law, the district court erred in ruling on the issue because "[t]he question of whether Mr. Baxter was a convicted felon at the time of the indictment was an issue of fact that should have been developed at trial for a jury . . . to decide." <u>Id.</u>

So too for Mr. Weathers's prior commitment.  Mr. Weathers impermissibly seeks dismissal because of his consent to treatment, a fact "beyond the four corners of the indictment," and urges the Court to agree that based on this new information, he was not committed to a mental institution as alleged in Count I.  <u>Baxter</u>, 579 F. App'x at 706; <u>see also</u> <u>United States v. Plummer</u>, 221 F.3d 1298, 1302 n.3 (11th Cir. 2000) (admonishing the district court for basing its conclusion "at least in part on its view of facts not alleged in the indictment").[5]  Further, by offering

_____

[5] Defendant's theory of voluntary treatment is particularly problematic in this regard.  Mr. Weathers claims he was serving 8 months in detention (obviously involuntarily) when presented with an opportunity to undergo treatment at a facility at his request.  But is mental health treatment truly voluntary when the alternative is jail?  Did Mr. Weathers demonstrate that he suffers from mental health problems

14

documentation of his counsel's signature to back the new facts claimed in his Reply Brief, Mr. Weathers openly asks the Court to review the evidence ahead of trial. But there can be no "pre-trial determination of sufficiency of the evidence." Critzer, 951 F.2d at 307.[6]  And while Mr. Weathers does not expressly claim that the Government cannot prove he was involuntarily committed, his framing of the issue as "undisputed" makes the same point.  (Def.'s Mot. 2); see Brantley, 461 F.

_____

at the hearing?  Even if Mr. Weathers were not in jail and wanted treatment, does the court mandate make the treatment involuntary?  To consider the extent of defendant's consent may prompt questions such as these that require considerations beyond the indictment best reserved for a jury at trial, not the Court on a pretrial motion.  See United States v. Baldwin, No. 117-CR-00276-ELR-JFK, 2018 WL 4520210, at *3 (N.D. Ga. May 30, 2018) ("[T]he resolution of factual questions is the sole province of the jury . . . Any issues that require consideration of the facts underlying this prosecution . . . are not the proper subject of a pretrial motion to dismiss.") (quoting United States v. Ferguson, 142 F. Supp. 2d 1350, 1353-54 (S.D. Fla. 2000)), R. & R. adopted, 2018 WL 3388137 (N.D. Ga. July 12, 2018); see also United States v. Peterson, 544 F. Supp. 2d 1363, 1373 (M.D. Ga. 2008) ("Defendant relies mainly on evidence that will likely be presented at trial that will show Defendant did not force inmate Strickland to work against his will.  At this stage, however, . . . [defendant's arguments] are not relevant.").

[6] For this reason, the undersigned did not direct the Government to file a sur-reply.  Defendant's Motion only contains his factual assertion that he was "never involuntarily committed to a mental institution." (Def.'s Mot. 3.)  The Government then provided the excerpt of Judge Salter's order in its Bill of Particulars and Response Brief.  (Bill of Particulars 2; Gov't Resp. 2.)  Should the presiding District Judge find defendant's challenge procedurally appropriate, the undersigned notes that the Government has not had an opportunity to respond to the additional arguments and evidence presented in defendant's Reply, including issues raised by defendant's supposed consent to treatment.  (See, e.g., infra note 8.)

App'x at 851 (reversing district court for dismissing an indictment because "the court concluded that nothing evidenced that Brantley took an affirmative act of concealment, a required element of the offense").

Similarly, Mr. Weathers may be right that his probation revocation proceedings were less formal than Georgia's statutory procedures governing commitment petitions.  See McIlwain, 772 F.3d at 696 (looking to state law in considering the formality of the defendant's commitment after construing the meaning of Section 922(g)(4)).[7]  However, like Mr. Baxter's claim that Alabama law showed his prior convictions were invalid, defendant's argument impermissibly challenges the sufficiency of the Government's evidence of his prior commitment.  Baxter, 579 F. App'x at 705-06.  The Court simply does not have the

---

[7] Unlike McIlwain, defendant's challenge does not raise the issue of whether "commitment" excludes voluntary treatment or informal proceedings under Section 922(g)(4), as its meaning is undisputed.  Rather, defendant challenges the facts underlying the indictment's claim of commitment, arguing they reveal that his treatment was voluntary and that his proceedings were too informal (i.e., he was not committed).  This does not raise a question of statutory interpretation, but of fact in applying the statute's language to defendant's prior proceedings.  See United States v. Van Jackson, No. 1:18-CR-15-AT-JKL-3, 2018 WL 6421882, at *2 (N.D. Ga. Sept. 5, 2018) (declining to "make fact findings relating to the charged conduct prior to trial" because "this Court may not dismiss an indictment based on a determination of facts" to be resolved by the jury), R. & R. adopted, 2018 WL 6415044 (N.D. Ga. Dec. 6, 2018).

authority to "grant[] a motion to dismiss predicated on the insufficiency of the evidence, whether it be based in fact or law." Salman, 378 F.3d at 1268 n.5 (emphasis added).

Conversely, the Court cannot hold that Mr. Weathers was indeed committed, as claimed by the Government. The Government argues that Judge Salter's "order shows that the Defendant had been involuntarily committed to a mental institution." (Gov't Resp. 3.) To agree with that assertion would also require the Court to weigh "the merits of the charges" before trial. Salman, 378 F.3d at 1267; see, e.g., United States v. Forey-Quintero, No. 1:08-CR-0353-BBM, 2009 WL 10688155, at *1-2 (N.D. Ga. Mar. 23, 2009) (observing that it would be "reversable error" to find that the defendant "is *not* [a] citizen" as the prosecution asked in opposing dismissal, where the defendant argued "he is not an alien" as alleged in the indictment). Because the Court cannot "grant a pre-trial judgment as a matter of law" on an element of the offense, it should not pick a side on this issue of defendant's commitment. Salman, 378 F.3d at 1268. Indeed, the facts surrounding it appear to be in dispute.[8]

---

[8] After defendant claimed he was never committed, but before he argued that this was due to his consent, the Government stated:

Therefore, the Court cannot rule on whether defendant was committed to a mental institution, because this would resolve "a required element of the offense" and employ an impermissible review of "the proffered evidence" of defendant's state court proceedings "in advance" of trial, as well as facts "beyond the face of the indictment." Brantley, 461 F. App'x at 851; Salman, 378 F.3d at 1267, 1269. Although both the Government and Mr. Weathers offer reasonable arguments for their respective version of events, the "determination of facts" behind the allegations in Count I is reserved for the jury. Sharpe, 438 F.3d at 1263. Should the Government seek to further its argument, it can do so in presenting its case at trial. As for Mr. Weathers, "a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29" after the close of the Government's case "is the proper avenue." Salman, 378 F.3d at 1268.

---

The judge ordered the sheriff's office to transport the Defendant to a residential treatment center where he was forced to meet the requirements of the substance abuse and mental health program. His physical person was taken by law enforcement to a facility where the court mandated he would receive mental health treatment—all without regard for whether the Defendant consented or not. If this is not an involuntary commitment to an institution for mental health treatment, then no such thing exists.

(Gov't Resp. 3 (emphasis added); see also supra note 6.)

18

Accordingly, the undersigned **REPORTS** that Count I should not be dismissed on the basis of defendant's objection to his alleged commitment.

## 2. Under Felony Indictment

Mr. Weathers next seeks to dismiss Count II of the indictment, which accuses him of violating 18 U.S.C. § 922(n). Section 922(n) makes the transportation or receipt of a firearm in interstate commerce "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year[.]" 18 U.S.C. § 922(n). Count II alleges as follows:

> On or about August 16, 2021, in the Northern District of Georgia, the defendant, ETHAN WEATHERS, knowing that he was under indictment as of December 2, 2020, for aggravated assault and false imprisonment, each charge a crime punishable by a term of imprisonment exceeding one year, in the Superior Court of Cobb County, Georgia, did receive, in and affecting interstate and foreign commerce, a firearm, that is, one (1) Glock 9mm, model 45, pistol, in violation of Title 18, United States Code, Sections 922(n) and 924(a)(l)(D).

(Indict. Count II.)[9]

Count II sufficiently alleges the elements of a Section 922(n) offense. It alleges that Mr. Weathers knew he was under indictment; that the previous charges

---

[9] Section 924(a)(1)(D) provides that whoever "willfully violates" the statute "shall be fined under this title, imprisoned not more than five years, or both." 18 U.S.C. § 924(a)(1)(D).

19

were punishable by over a year imprisonment; that he received a firearm; and that the firearm was in and affected interstate commerce. See United States v. Barnes, 469 F. App'x 733, 735 n.1 (11th Cir. 2012) (per curiam) (identifying the essential elements of a Section 922(n) charge). Count II further apprises Mr. Weathers of what he must meet at trial by alleging the requisite knowledge, the date of the underlying indictment, the court that rendered it, the type of firearm received, the venue of the offense, and the statute outlawing the conduct. Thus, "[t]he indictment expressly refers to the statutory provisions on which the charges were based and the date of the incident in question[] and, accordingly, provides notice to [Mr. Weathers] of the charges he face[s] and would preclude any subsequent prosecution for the same offense." United States v. Rivero, 218 F. App'x 958, 958-59 (11th Cir. 2007) (per curiam) (finding Section 922(n) charge sufficient even though it alleged the defendant had been "previously charged by indictment" on the date alleged instead of accusing the defendant of being "under" indictment when possessing a firearm). Because Count II adequately states a Section 922(n) offense and informs Mr. Weathers of the charges, the indictment is sufficient on its face. See id. at 958; Salman, 378 F.3d. at 1268.

Though he does not argue to the contrary, "Mr. Weathers moves to dismiss on undisputed facts" that he claims show he was not "under indictment" on August 16, 2021 as alleged in Count II.  (Def.'s Mot. 2; <u>see also id.</u> at 3 ("[I]t is undisputed that Mr. Weathers was not under indictment at the time of the alleged firearm possession."); <u>but see</u> Gov't Resp. 3-4 & Bill of Particulars 2 (disputing this)); <u>see also</u> <u>Salman</u>, 378 F.3d at 1267-68 (reversing district court for "in effect grant[ing] summary judgment in favor of the defendant" because "[t]here is no summary judgment procedure in criminal cases") (quoting <u>Critzer</u>, 951 F.2d at 307).  Like his first objection, this is not a claim that the indictment provides insufficient information or notice of the charges, but a claim that attempts to rebut them ahead of trial.  Accordingly, Count II should not be dismissed on this basis, and the instant challenge should be rejected summarily for the reasons set forth <u>supra</u> Part II.A.1.

As with Count I, however, the undersigned will address defendant's arguments to provide a thorough report and recommendation.  Mr. Weathers offers two reasons why he was not "under indictment" on August 16, 2021.  First, Mr. Weathers argues that he was "charged by 'Accusation'" on December 2, 2020, "but never under an indictment."  (Def.'s Mot. 3.)  Next, Mr. Weathers argues that he

21

"was under a diversionary disposition" of the charges, making the "Accusation" obsolete at the time of his alleged receipt of a firearm.  (Id.)

In his first argument, Mr. Weathers claims that he was charged by an "Accusation" in the Superior Court of Cobb County, not an "indictment" as alleged in Count II and as required by Section 922(n).  Even if the Court could accept this detail, it offers Mr. Weathers no support.  Federal law defines an "indictment" as "an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted."  18 U.S.C. § 921(a)(14).  Here, Count II alleges that Mr. Weathers was indicted for "aggravated assault and false imprisonment, each charge a crime punishable by a term of imprisonment exceeding one year, in the Superior Court of Cobb County, Georgia."  (Indict. Count II.)  This meets the statutory definition.  18 U.S.C. § 921(a)(14); see also Rivero, 218 F. App'x at 958-59.  Moreover, Count II expressly refers to "each charge" of the state court indictment.  (Indict. Count II.)  Under Georgia law, the ordinary meaning of the word "charged" in the criminal context refers to an "[a]ccusation of crime by complaint, indictment, or information."  State v. Perkins, 580 S.E.2d 523, 525 (Ga. 2003) (quoting Black's Law Dictionary, p. 212 (5th ed. 1979)); see also O.C.G.A. § 17-7-70 (providing that "upon an

accusation filed by the district attorney," a defendant may waive an "indictment" by a grand jury in entering a plea); (Def.'s Reply Ex. 2 [19-2] (order from defendant's state proceedings referring to the December 2, 2020 charges as an "Indictment/Accusation").)

Mr. Weathers next claims that he could not have been under the December 2, 2020 accusation when he was found with a firearm on August 16, 2021, because he "was under a diversionary disposition" of the case at that time.  (Def.'s Mot. 2.) In support of the Motion, Mr. Weathers attached a copy of a guilty plea he entered on December 10, 2020 that he claims resolved the accusation.  (Id. Ex. 1 [15-1].) In response, the Government asserts that after Mr. Weathers entered his plea, the court sentenced him under Georgia's First Offender Act, and that "[t]his status continued until he was arrested in Polk County for possessing a firearm."  (Gov't Resp. 3; see also Bill of Particulars 2.)  In Reply, Mr. Weathers claims that once he entered his plea, the accusation "served its function and is a fiction," and that he was therefore "not 'under indictment' per § 922(n)" after December 10, 2020. (Def.'s Reply 14.)  He further argues that this is particularly true here because his diversionary disposition involved withholding his First Offender sentence while he proceeded through Mental Health Court.  (Id. at 9-14.)

Putting aside for a moment that Count II mentions none of this, Mr. Weathers is correct that in most cases, an indictment serves its purpose once a guilty plea is entered. Indeed, a guilty plea "stands upon the same footing as a conviction by a jury" in Georgia, "and has the same force and effect as a verdict of guilty, and therefore amounts to an adjudication as to the existence of every element necessary to the establishment of guilt of the offense charged." Pope v. State, 310 S.E.2d 575, 576 (Ga. Ct. App. 1983) (internal quotation marks and citation omitted); see also Williams v. State, 330 S.E.2d 435 (Ga. Ct. App. 1985) ("A plea of guilty is a conviction of the highest order . . .") (citations omitted); Burrell v. United States, 384 F.3d 22, 28 (2d 2004) (looking to state law to determine whether a plea constituted a felony conviction). But Georgia's First Offender Act departs from this general rule, as the Government implies.

Under the Act, a defendant may enter a guilty plea, serve a probationary sentence or term of imprisonment, and possibly avoid a criminal conviction if he abides by the terms of the sentence. See Davis v. State, 496 S.E.2d 699, 702 (Ga. 1998) (citing O.C.G.A. §§ 42-8-60, 42-8-62(a)). Thus, "in a First Offender Act case, the entry of a guilty plea does not result in an adjudication of guilt—it simply starts the process of allowing the defendant to serve his sentence, with the matter

only later ending in either exoneration if the defendant performs well or adjudication of guilt if he does not." United States v. Williams, No. 1:20-CR-85-MLB-CCB, 2021 WL 1897491, at *4 (N.D. Ga. Feb. 11, 2021), R. & R. adopted, 2021 WL 1248555 (N.D. Ga. Apr. 5, 2021).  "And because a First Offender Act defendant stands neither convicted nor discharged during the period of probation, the necessary implication is that he therefore remains subject to the indictment—in terms of § 922(n), he is 'under indictment.'" Id. (citing United States v. Bonds, No. 216-CR-00034-WCO-JCF, 2017 WL 2991804, at *3 (N.D. Ga. Mar. 10, 2017), R. & R. adopted, 2017 WL 2991465 (N.D. Ga. July 13, 2017)); see also United States v. Fabiano, No. CV-223-CR-00001-RWS-JCF, 2023 WL 9597783, at *11-15 (N.D. Ga. Nov. 21, 2023) (agreeing with Williams and Bonds), R. & R. adopted, 2024 WL 196480 (N.D. Ga. Jan. 17, 2024).

Assuming the Court could accept that Mr. Weathers pled guilty, he would have still remained under the accusation on August 16, 2021 because he had not yet been adjudicated for those offenses.  To borrow his words, the court diverted the disposition of the accusation pending the outcome (completion or violation) of defendant's probation, which began after the court entered defendant's guilty plea. (See Def.'s Mot. 3 ("[A]t the time of the alleged firearm possession . . . [h]e had

been charged by 'Accusation' and was under a diversionary disposition" of the charges.).)

Though the Government does not explain this process, it argues that the status of defendant's First Offender sentence continued until he was arrested in Polk County.   But according to Mr. Weathers, "[t]hat is not exactly what happened."  (Def.'s Reply 9.)  After the court entered his guilty plea, he explains, the court "withheld" its sentence on the condition that Mr. Weathers satisfy the requirements of a Mental Health Court program.  (Id.)  Further departing from the face of the indictment before this Court, Mr. Weathers introduces an order of the Cobb County Superior Court entered on December 10, 2020, the same date of his proffered guilty plea (and days after the indictment alleged in Count II).  The order provides:

> The defendant has entered a plea of guilty to the above-styled Indictment/Accusation, and has been accepted as a pre-adjudication participant in the Mental Health Court Program.  IT IS THEREFORE ORDERED that sentencing is WITHHELD pending the defendant's completion of said program.  The State has stated its intention, should the defendant successfully complete said program, to move that this guilty plea be withdrawn and request an order of Nolle Prosequi be entered.  However, should the defendant fail to successfully complete Mental Health Court for any reason, this case shall be placed on the active calendar of this court for sentencing, without further Order from this Court.

26

(Def.'s Reply Ex. 2.)

Mr. Weathers argues that this "sentencing" was not under the Georgia First Offender Act, but under the Mental Health Court statute, allowing his First Offender sentence to be withheld pending his participation in the program.  (Def.'s Reply 9.)  However, Mr. Weathers does not explain how this would affect the underlying accusation, let alone dissipate it.   While defendant offers several distinctions between Georgia's Mental Health Court statute and the First Offender Act, none of those differing procedures free him from the charges until the end of a probationary period.  For example, if Mr. Weathers successfully completed the Mental Health Court program, the prosecution "may" dismiss the case, or the court may reduce or modify defendant's overarching sentence to account for the time spent in the program.  O.C.G.A. § 15-1-16(c).  Alternatively, if Mr. Weathers failed to complete the program or violated its terms, the superior court would order him to return for sentencing.  See id.; (Def.'s Reply Ex. 2.)  Like a First Offender Act sentence, adjudication of a Mental Health Court participant is withheld during a probationary period, where the participant's "conduct would determine" the ultimate outcome of the charges.  United States v. Adger, No. CR 122-102, 2023 WL 3229933, at *1 (S.D. Ga. May 3, 2023) (noting the defendant had not yet been

27

adjudicated guilty under the First Offender Act and was still under indictment while "on probation on June 9, 2022, the offense date alleged in the § 922(n) charge"), R. & R. adopted, 2023 WL 3627840 (S.D. Ga. May 24, 2023).

Thus, what defendant's argument appears to describe is a form of pre-probation probation, revealing its incoherence. As explained, a First Offender defendant is not adjudicated until after his sentence concludes in success or failure, and remains under the charges in the interim. The sentence itself is a probationary period. Participation in the Mental Health Court is also a probationary period that, at least for Mr. Weathers, defers a First Offender sentence (the next probationary period). So, if Mr. Weathers would still be under the accusation post-sentencing, it is hard to see how he would not be under the accusation pre-sentencing while participating in this program. If anything, the superior court's order would appear to only prolong the life of the accusation, not end it. Indeed, the order explicitly identifies Mr. Weathers as both "the defendant" and "a pre-adjudication participant." (Def.'s Reply Ex. 2.) Further, Mr. Weathers twice admits that as a result of his August 16, 2021 arrest, the court sentenced him under the First Offender Act for the charges brought against him in the accusation. (Id. at 9, 14

n.4.)  This clearly suggests that Mr. Weathers remained subject to those charges while participating in the Mental Health Court program.[10]

Having now addressed defendant's arguments, it is worth recalling that their merits are beside the point.  The Motion cannot be resolved on the basis of defendant's proceedings following the December 2, 2020 indictment because "the four corners" of Count II say nothing about them.  Baxter, 579 F. App'x at 706. The indictment makes no mention of defendant's guilty plea or First Offender status, and its corners should not be stretched to include them for the Court's consideration.  To invite evidence of defendant's Mental Health Court participation on top of this would only stretch the indictment farther from its face, and this Court closer towards reversal.  See Forey-Quintero, 2009 WL 10688155, at *1-2.  The undersigned sees no procedural difference between defendant's claim that his state

---

[10] Although defendant admits that his "adjudication is withheld" under these proceedings, at least "in the colloquial sense," he asks the Court to apply the rule of lenity to conclude he was not "under indictment" under Section 922(n).  (Def.'s Reply 12, 14.)  It is true that there may still be questions about defendant's state proceedings, including his understanding of them.  (See id. at 14 ("Indeed, how could a person possibly know he is 'under indictment' in this scenario . . .?").)  But for reasons already discussed, those questions should be addressed at trial by the evidence.  See Baxter, 579 F. App'x at 706.  And while some of that evidence may be ambiguous at this early stage, the meaning of Section 922(n) is not.  See Williams, 2021 WL 1897491, at *6 (rejecting similar rule of lenity argument); Bonds, 2017 WL 2991804, at *7 (same).

indictment became "a fiction" at some point before his arrest and Mr. Baxter's claim that his state conviction became invalid at some point before his federal indictment.  (Def.'s Reply 17); Baxter, 579 F. App'x at 706.  Both claims are "precisely what the *Salman* and *Critzer* courts forbid" on a motion to dismiss. United States v. Kelly, No. 07-60111-CR, 2007 WL 2904153, at *1 (S.D. Fla. Oct. 4, 2007) (rejecting defendant's argument that Florida's criminal procedures "render[ed] his guilty plea subject to being vacated," and that "[f]or this reason alone, Defendant's motion must be denied"); see also United States v. Fillingim, 688 F. App'x 670, 673 (11th Cir. 2017) (per curiam) (expressing suspicion that the defendant could challenge the legal basis for his former convictions in a motion to dismiss even though that issue was not on appeal).

On both Counts, Mr. Weathers essentially "asserts that, as a matter of law and based upon evidence outside the four corners of the indictment," he was neither committed nor under state indictment.  Forey-Quintero, 2009 WL 10688155, at *2. But "whether it be based in fact or law," this impermissibly "argues that the evidence is insufficient to support the charge[s] in the indictment."  Id. (quoting Salman, 378 F.3d at 1269 n.5).  Therefore, despite defendant's attempts to disprove those allegations, "Salman forbids this court from dismissing the indictment on this

30

basis." Id.; see also United States v. Covington, No. 116-CR-145-TWT-JKL-15, 2017 WL 10410076, at *3 (N.D. Ga. Oct. 5, 2017) ("To the extent that Covington contends that the government is relying on untrue facts in the indictment or that the evidence is insufficient to support the charges, those defenses should be presented at trial rather than at this stage of the proceedings."); United States v. Adkinson, 392 F. Supp. 2d 1378, 1382 (M.D. Fla. 2005) (finding Salman precluded dismissal of the indictment based on defendant's claim that "her actions . . . did not violate the federal law under which she was indicted"). At this stage, it is sufficient for the indictment to allege that Mr. Weathers was committed to a mental institution and under indictment.

Accordingly, the undersigned **REPORTS** that Count II should not be dismissed on the basis of defendant's objection to allegedly being under indictment upon his arrest.

### B. Defendant's Constitutional Challenges

Mr. Weathers argues that the indictment should be dismissed because Sections 922(g)(4) and 922(n) are unconstitutional under the Second Amendment, both facially and as applied to him. (Def.'s Mot. 3-10 & Def.'s Reply 27-31 (Count I); Def's Mot. 10-11 & Def.'s Reply 15-27 (Count II).) The Government disagrees. (Gov't Resp. 7-9 (Count I), 10-17 (Count II).)

31

As an initial matter, defendant's as-applied challenge is premature. Mr. Weathers challenges the Government's evidence for its claim that he had previously been committed to a mental institution and under indictment when arrested in Polk County. (Supra Part II.A.) Therefore, defendant's "as-applied" arguments "should be considered after the presentation of evidence at trial." United States v. Graves, No. 1:13-CR-417-WSD-JSA, 2014 WL 2589428, at *5 (N.D. Ga. June 9, 2014). If Mr. Weathers contends "that the evidence as presented at trial does not support" those elements, he can file a motion for acquittal under Rule 29. Id. (citing Salmon, 378 F.3d at 1268); see also Farrier, 2024 WL 184451, at *3 (observing the defendant's "assertions as to his as-applied challenge would require the Court to go well outside the facts presented in the indictment and to make factual findings that it simply cannot do so at this stage").

Unlike an as-applied challenge, a facial challenge "seeks to invalidate a statute or regulation itself." United States v. Frandsen, 212 F.3d 1231, 1235 (11th Cir. 2000). The party bringing the facial challenge "bears the burden of proving that the law could never be applied in a constitutional manner." DA Mortg., Inc. v. City of Miami Beach, 486 F.3d 1254, 1262 (11th Cir. 2007). Here, Mr. Weathers must show that the firearm regulations are "unconstitutional in all of [their]

applications" or that they do not have "a plainly legitimate sweep."  United States v. Jones, 673 F. Supp. 2d 1347, 1352 (N.D. Ga. 2009) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)).

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In District of Columbia v. Heller, the Supreme Court held that this text codifies a pre-existing individual right of the people to bear arms.  554 U.S. 570, 595 (2008).  The Court explained that the right is not unlimited, but held that the District of Columbia's ban on handgun possession for ordinary citizens in the home was unconstitutional.  Id. at 626-27, 635-36.  To reach its decision, the Court examined the history of the Second Amendment to glean the original understanding of its text and ordinary meaning. Id. at 624-26.

After Heller, lower courts developed a two-step test that combined history with means-end scrutiny to assess Second Amendment claims.  The Supreme Court rejected that two-step approach in New York Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022).  The petitioners in Bruen were "ordinary, law-abiding, adult citizens" that were required by New York law to demonstrate "a special need for

self-defense" before obtaining a license to carry a firearm.  Id. at 11, 31-32.  The

Court struck down New York's licensing scheme as violative of the Second

Amendment.  Id. at 11.  In doing so, the Court clarified "the standard for applying

the Second Amendment" as follows:

> When the Second Amendment's plain text covers an individual's
> conduct, the Constitution presumptively protects that conduct.  The
> government must then justify its regulation by demonstrating that it is
> consistent with the Nation's historical tradition of firearm regulation.
> Only then may a court conclude that the individual's conduct falls
> outside the Second Amendment's "unqualified command."

Id. at 24.

On the second step of the analysis, courts must assess whether the firearm

regulation is consistent with the "historical understanding" of the right to keep and

bear arms.  Bruen, 597 U.S. at 26.  This assessment can be "fairly straight forward"

when a modern regulation "addresses a general societal problem that has persisted

since the 18th century."  Id.  In such cases, "the lack of a distinctly similar historical

regulation addressing that problem is relevant evidence that the challenged

regulation is inconsistent with the Second Amendment."  Id.  Other relevant

evidence includes historical regulations addressing the societal problem through

materially different means, or proposals that sought to address the problem which

were rejected on constitutional grounds.  Id. at 26-27.

While the historical question may be straight forward in some cases, "a more nuanced approach" may be required in "cases implicating unprecedented societal concerns or dramatic technological changes." Bruen, 597 U.S. at 27. There too, courts must be guided by history in considering "modern regulations that were unimaginable at the founding." Id. at 28. "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a common place task for any lawyer or judge." Id. at 28. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" Id. at 28-29 (citation omitted).

In determining whether the regulations are "relevantly similar," courts should use "applicable metric[s]," including (1) "how and why the regulations burden a law-abiding citizen's right to armed self-defense," and (2) "whether that burden is comparably justified." Bruen, 597 U.S. at 29 (but these metrics are not exhaustive) (citations omitted). However, this inquiry does not allow for "balance[ing] through means-end scrutiny" by courts, and instead focuses on the "interest balancing *by the people*." Id. at 29 n.7 (citing Heller, 554 U.S. at 635).

35

And while the Government must point to more than a historical analogue that "remotely resembles" the modern regulation, it need not identify "a historical *twin*" for the regulation to pass constitutional muster.  Id. at 30.

### 1. Section 922(g)(4)

Section 922(g)(4) makes it unlawful for any person "who has been adjudicated as a mental defective or who has been committed to a mental institution . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(4).  The Government argues that Section 922(g)(4) is constitutional because there is a historical tradition of preventing potentially dangerous persons with demonstrated mental health issues from possessing firearms.  The Government relies upon historical evidence of this understanding and practice, as well as the following statement in Heller:  "[N]othing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]"  544 U.S. at 626 (emphasis added).  Mr. Weathers argues that the Government has not met its burden of demonstrating a historical basis for such regulations, and that the Court should not

36

rely upon <u>Heller</u>'s "dicta" because "nothing can be gleaned" from this statement after <u>Bruen</u>.  (Def.'s Reply 28; <u>see also</u> Def.'s Mot. 9 n.1.)

### a.  Is the Bruen Framework On Point?

In <u>Heller</u>, the Supreme Court made clear that the right to possess a firearm "was not unlimited," and belonged to "responsible citizens."  544 U.S. at 626, 635. Therefore, the Court reasoned, longstanding prohibitions on certain groups' ability to possess firearms were appropriate and constitutional, stating:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, ***nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill***, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

<u>Id.</u> at 626-27 (emphasis added).  The Supreme Court assured that such prohibitions are "presumptively lawful regulatory measures."  <u>Id.</u> at 627 n.26.

Not long after this direction from the Supreme Court, the Eleventh Circuit decided <u>United States v. Battle</u>, 347 F. App'x 478 (11th Cir. 2009) (per curiam). In <u>Battle</u>, the Circuit considered a challenge to 18 U.S.C. § 922(g)(1), which outlaws firearm possession by convicted felons.  <u>Id.</u> at 479.  The Circuit quickly dispensed with a Second Amendment challenge based solely upon <u>Heller</u>'s direction:

37

> Because the Supreme Court in *Heller* stated that "the right secured by
> the Second Amendment is not unlimited" and "nothing in our opinion
> should be taken to cast doubt on longstanding prohibitions on the
> possession of firearms by felons and the mentally ill," Battle's
> argument that the permanent prohibition of the right to bear arms, as
> found in 18 U.S.C. § 922(g)(1), violates the Second Amendment is
> without merit.

Id. at 480.

A year later, in United States v. Rozier, the Eleventh Circuit again relied on

Heller's statement about longstanding restrictions on the gun rights of certain

groups to affirm the constitutionality of Section 922(g)(1).  598 F.3d 768, 770-71

(11th Cir. 2010).  Relying on Heller, the Circuit again recognized that Second

Amendment rights are "not unlimited" and that "the initial question is whether one

is *qualified* to possess a firearm."  Id. at 770 (emphasis in original).  Rozier held

that "statutes disqualifying felons from possessing a firearm under any and all

circumstances do not offend the Second Amendment."  Id. at 771.  The Circuit

reasoned that Mr. Rozier's Second Amendment right to bear arms was not weighed

in the same manner as that of a responsible, law-abiding citizen, and that the Heller

opinion clearly stated that the Supreme Court did not intend to cast doubt on such

longstanding prohibitions.  Id.

Shortly after the Eleventh Circuit decided <u>Rozier</u>, a plurality of the Supreme Court "repeat[ed]" its "assurances" that <u>Heller</u> "did not cast doubt on such longstanding regulatory measures." <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 786 (2010) (plurality opinion). This further confirmed both <u>Heller</u> and <u>Rozier</u>'s determinations that long-held laws disqualifying some groups from possessing a firearm do not offend the Second Amendment.

<u>Bruen</u> is not to the contrary, and says so expressly in the first paragraph of the opinion. 597 U.S. at 10 (describing its holding as "consistent with *Heller* and *McDonald*"). While the first step of the <u>Bruen</u> analysis considers whether the Second Amendment's text covers the "course of conduct" (there, "carrying handguns"),[11] Justice Thomas repeatedly limited his analysis to the rights of "law-

---

[11] Assuming <u>Bruen</u> is on point, there appears to be some confusion on this step. (<u>See</u> Gov't Resp. 5 (arguing "sections 922(g)(4) and 922(n) proscribe conduct outside the scope of the Second Amendment's protections," but even if it did, they are analogues to historical regulations); <u>id.</u> at 5-6 (assuming "Defendant's conduct is covered by the Second Amendment"); Def.'s Mot. 3 ("the plain text of the Second Amendment covers Mr. Weather[s]'s charged conduct"); Def.'s Reply 15 ("The first issue is whether the Second Amendment covers the conduct at issue, here Mr. Weather[s]'s charged possession of a firearm."); <u>id.</u> at 27 ("Mr. Weathers is among the 'people' protected.").) The Government does not provide an analysis here, and the undersigned assumes that the conduct at issue is the possession or receipt of a firearm, meeting the first step. That someone is under indictment or previously committed speaks to <u>who</u> may engage in that conduct under federal law, which the Government can argue is consistent with the Nation's historical tradition.

abiding, responsible citizens" throughout his majority opinion.  <u>See</u> <u>id.</u> at 26, 32,

34, 70.  For example, in a footnote, the Court stated that licensing regimes requiring

background checks and/or firearms safety courses were permissible because they

"are designed to ensure only that those bearing arms in the jurisdiction are, in fact,

'law-abiding, responsible citizens.'"  <u>Id.</u> at 38 n.9 (quoting <u>Heller</u>, 554 U.S. at 635).

And several Justices went out of their way to make clear that the opinion was not

intended to address the Second Amendment rights of certain groups that are not

considered responsible citizens in this regard, including felons, minors, and the

mentally ill.

> In a concurring opinion, Justice Alito stated as follows:
>
> That is all we decide.  Our holding decides nothing about **who may lawfully possess a firearm** or the requirements that must be met to buy a gun.  Nor does it decide anything about the kinds of weapons that people may possess.  **Nor have we disturbed anything that we said in _Heller_ or _McDonald_ v. _Chicago_**, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2018) about restrictions that may be imposed on the possession or carrying of guns.

<u>Bruen</u>, 597 U.S. at 72 (Alito, J., concurring) (emphasis added); <u>see also</u> <u>id.</u> at 73

(Alito, J., concurring) (assuming validity of laws prohibiting minors from

---

But, as will be explained, <u>Bruen</u> "decides nothing about who may lawfully possess" or receive a firearm.  597 U.S. at 72 (Alito, J., concurring).

possessing firearms).  Another concurring opinion written by Justice Kavanaugh and joined by Chief Justice Roberts underscored two similar "important points about the limits of the Court's decision." Id. at 79 (Kavanaugh, J., concurring). First, "[t]he Court's decision addresses only the unusual discretionary licensing regimes" that violated the rights of "ordinary, law-abiding citizens." Id. (citations omitted).  Second, and relatedly, "the Second Amendment allows a 'variety' of gun regulations" in other contexts, including the "examples" of "longstanding prohibitions on the possession of firearms by felons and the mentally ill" the Court provided in Heller and McDonald.  Id. at 80-81.

"As such, Bruen provides no basis to second-guess Heller's statements about restricting firearm access for felons, and thus, no reason to second-guess Rozier." United States v. Pleasant, No. 1:22-CR-298-JPB-CMS, 2023 WL 7394862, at *3 (N.D. Ga. Oct. 19, 2023) (Salinas, M.J.), R. & R. adopted, 2023 WL 7389005 (N.D. Ga. Nov. 7, 2023) (Boulee, J.).  Therefore, Rozier remains binding precedent in this Circuit.[12]

_____

[12] Other judges in this District concur.  See United States v. Childs, No. 1:22-CR-000327-LMM-LTW, 2023 WL 6892132, at *1 (N.D. Ga. Aug. 18, 2023) (Walker, M.J.) ("Bruen is not on point and Rozier remains controlling precedent.") (internal quotation marks and citation omitted), R. & R. adopted, 2023 WL 6845830 (N.D. Ga. Oct. 16, 2023) (May, J.); Gordon v. United States, No. 1:22-

Neither party cites <u>Rozier</u>.  That is understandable.  The Eleventh Circuit issued the decision before <u>Bruen</u>, and Section 922(g)(4) was not challenged.  But <u>Rozier</u> did not limit its reasoning to convicted felons.  After discussing <u>Heller</u>, the Eleventh Circuit summarized its holding as follows:  "Thus, statutory restrictions of firearm possession, <u>such as</u> § 922(g)(1), are a constitutional avenue to restrict the Second Amendment right of <u>certain classes of people</u>.  Rozier, by virtue of his felony conviction, falls within such a class."  <u>Rozier</u>, 598 F.3d at 771 (emphasis added).  The Circuit also rejected an argument mirroring defendant's, noting:  "[T]o the extent that . . . *Heller* limits the Court's opinion to possession of firearms by *law-abiding* and *qualified* individuals, it is not dicta."  <u>Id.</u> at 771 n.6 (emphasis in original).  And even if it were, the Circuit would have still given it considerable weight, because dicta "from the Supreme Court is not something to be lightly cast aside."  <u>Id.</u> (quoting <u>Peterson v. BMI Refractories</u>, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997)).

---

CV-2949, 2023 WL 336137, at *1 (N.D. Ga. Jan. 20, 2023) (Ross, J.) ("Nothing in <u>Bruen</u> . . . indicates that the statute that criminalizes the possession of a firearm by a convicted felon is unconstitutional."); <u>United States v. Williams</u>, No. 1:21-CR-362-LMM-LTW, 2022 WL 17852517, at *2 (N.D. Ga. Dec. 22, 2022) (May, J.) (finding that <u>Rozier</u> remained binding precedent after <u>Bruen</u> because <u>Bruen</u> involved the "Second Amendment rights of 'law-abiding citizens,'" and "[i]t is axiomatic that a felon is not a law-abiding citizen").

As binding precedent, <u>Rozier</u>'s analysis of qualified individuals cannot be overlooked, nor is it any less sound when applied to Section 922(g)(4).  And, for the same reasons why <u>Rozier</u> remains good law after <u>Bruen</u>, its application beyond Section 922(g)(1) would be entirely consistent with Supreme Court precedent. <u>Heller</u> and <u>Bruen</u> recognize that the Second Amendment protects the right of an "ordinary," "responsible," and "law-abiding citizen to possess a handgun." <u>Bruen</u>, 597 U.S. at 8-9; <u>Heller</u>, 554 U.S. at 634.  Longstanding regulations that restrict firearm possession for people outside of that description are presumably lawful, and <u>Bruen</u> says "nothing" about those groups' ability to possess a firearm.  <u>Heller</u>, 544 U.S. at 627 n.26; <u>Bruen</u>, 597 U.S. at 72 (Alito, J., concurring); <u>id.</u> at 79-81 (Kavanaugh, J., concurring).

Mr. Rozier was not a qualified individual receiving full Second Amendment protection because as a felon, he was not an ordinary, responsible, and law-abiding citizen.  But as <u>Rozier</u> openly suggests, several other groups addressed by Section 922 would fail to fit that description, if not all of them.  598 F.3d at 771.  As for those who have been committed to a mental institution, the Eleventh Circuit said as much in <u>McIlwain</u>, which dealt directly with the scope of Section 922(g)(4).

After rejecting a collateral attack on the defendant's commitment proceedings, the Eleventh Circuit again observed that "the right recognized in *Heller* [is] a qualified right—not intended to 'cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill.'" McIlwain, 772 F.3d at 698 (quoting Heller, 554 U.S. at 626-27); see also Mai v. United States, 952 F.3d 1106, 1114 (9th Cir. 2020) ("Like the federal prohibition as to felons, § 922(g)(4) had been on the books for decades when the Court decided *Heller*."); United States v. McRobie, No. 08-4632, 2009 WL 82715, at *1 (4th Cir. Jan. 14, 2009) (unpublished) (relying on Heller's presumption to affirm constitutionality of Section 922(g)(4)); United States v. Gould, No. 2:22-CR-00095, 2023 WL 3295597, at *6 (S.D.W. Va. May 5, 2023) (finding Section 922(g)(4) constitutional, noting that "*Bruen* does not question the 'longstanding regulatory measures' declared presumptively lawful in *Heller* and *McDonald* . . . Moreover, since *Bruen*, many courts . . . have relied on that presumption to uphold the constitutionality of various provisions of § 922(g).") (citations omitted).[13]

---

[13] Defendant argues that even if the Court relied upon the "dicta" from Heller, rather than Bruen's historical framework, it would not apply to Section 922(g)(4) because that provision does not prohibit those who are mentally ill from possessing a firearm. (Def.'s Reply 28 (citing McIlwain, 772 F.3d at 695).) That is partly true, but not helpful for Mr. Weathers. In interpreting Section 922(g)(4),

Putting these precedents together reveals one coherent answer to the constitutional questions raised in this case. Bruen does not disturb Heller's statement that the possession of a firearm is a qualified right. This necessarily means some people will not be able to exercise that right as fully as others depending upon the qualification. In determining these bounds, those who are ordinary, responsible, law-abiding citizens are qualified individuals who enjoy strong protection. Those who do not fit that description are unqualified individuals and do not receive as great a protection. Heller provided a historical framework for assessing the Second Amendment rights of the former individuals, Bruen clarified that framework, and neither applied it to the latter individuals. Moreover,

---

McIlwain observed that it does not provide for a sweeping prohibition that prevents people who are mentally ill from possessing firearms. 772 F.3d at 695. Its text does not say this, and "such a free floating prohibition would be very hard to administer." Id. (quoting United States v. Rehlander, 666 F.3d 45, 50 (1st Cir. 2012)). The law undoubtably regulates firearm possession for the mentally ill, but only to the extent one is adjudicated mentally defective or committed to a mental institution. Id. ("Instead, as with the ban on prior felons, Congress sought to piggyback on the determinations made in prior judicial proceedings to establish status.") (internal quotation and citations omitted). Assuming Section 922(g)(4)'s regulation of the mentally ill is narrower than the longstanding prohibitions Heller recognized as lawful, defendant does not explain how this would cut against its legality. And although defendant cites McIlwain, he ignores the part of the opinion that found Heller's presumption about the mentally ill applicable to Section 922(g)(4). Id. at 698 (citing Heller, 554 U.S. at 626-27).

<u>Heller</u> expressly directed that longstanding laws that restrict those unqualified individuals' ability to possess a firearm are presumably constitutional, and <u>Bruen</u> left that direction untouched.  On these grounds, the Eleventh Circuit held that felons are not "qualified individuals," and that "statutory restrictions of firearm possession . . . of certain classes of people," "such as" those addressed by Section 922(g)(1), are plainly constitutional.  <u>Rozier</u>, 598 F.3d at 770-71, 771 n.6 (emphasis omitted).  And while short of a holding, the Eleventh Circuit has also observed that, like felons, those who have been committed to a mental institution are another certain class of people that may be lawfully precluded from possessing a firearm. <u>McIlwain</u>, 772 F.3d at 698 (citing <u>Heller</u>, 554 U.S. at 626-27).

Here, Mr. Weathers has not shown that a person who has been committed to a mental institution is a responsible, ordinary citizen whose rights are addressed by <u>Bruen</u>.  In fact, he admits that under a plain reading of the statute, if one is "committed," he is involuntarily placed into a mental institution for treatment beyond mere observation.  (Def.'s Reply 2 (citing <u>McIlwain</u>, 772 F.3d at 694).) Whether this is done because of drug use, mental defectiveness, or a mental illness, the result is the same—he is, quite literally, removed from ordinary society.  <u>See</u> <u>McIlwain</u>, 772 F.3d at 694 (citing 27 C.F.R. § 478.11).

Nor can Mr. Weathers rebut the point that, according to Congress, those who are convicted felons, committed to a mental institution, habitual users of controlled substances, minors,[14] or any other group addressed by Section 922 are simply not considered responsible citizens when it comes to firearms.  See Rozier, 598 F.3d at 770-71; McIlwain, 772 F.3d at 698; see also Bruen, 597 U.S. at 38 n.9 (discussing permissible measures that seek to ensure those bearing arms "are, in fact, . . . 'responsible citizens'") (quoting Heller, 554 U.S. at 635); United States v. Beaty, No. 6:22-CR-95-PGB-DCI, 2023 WL 4662247, at *3 (M.D. Fla. July 20, 2023) (applying Heller's presumptive language to Section 922(g)(3), dealing with habitual drug use, noting Bruen is not to the contrary).  This understanding is not

---

[14] Rozier, McIlwain, and Heller all acknowledged the validity of laws pertaining to certain groups understood by the peoples' representatives to be too irresponsible to possess firearms.  Consistent with this understanding, Justice Alito all but confirmed that Section 922 is one such lawful measure in Bruen, citing it directly:  "Our decision, as noted, does not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of 18, 18 U. S. C. §§ 922(x)(2)-(5), and bars the sale of a handgun to anyone under the age of 21, §§ 922(b)(1), (c)(1)."  597 U.S. at 73 (Alito, J., concurring) (arguing that the dissent's invocation of adolescent gun violence statistics is inapposite to Bruen's holding and already illegal) (footnote omitted).  And even if Bruen did expand the categories of protected people, both "children [and] the mentally unbalanced" were historically disarmed because the founding-era public perceived them as too irresponsible to possess arms.  United States v. Bena, 664 F.3d 1180, 1183-84 (8th Cir. 2011) (citations omitted).

only obvious from the text of Section 922, but it is expressly recognized by the Supreme Court and Eleventh Circuit.  See McIlwain, 772 F.3d at 693 (discussing several "categories of prohibited persons" under Section 922(g)); id. (observing that "[i]n enacting section 922(g), Congress sought [] to bar the possession of firearms by certain types of persons" that are not ordinary, responsible citizens, but "persons that it considered dangerous") (quoting United States v. Winchester, 916 F.2d 601, 605 (11th Cir. 1990)); Barrett v. United States, 423 U.S. 212, 218 (1976) ("The very structure of the Gun Control Act . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous."); Lewis v. United States, 445 U.S. 55, 64 (1980) (observing "[e]ach Title" of the Act applies to "categories of presumptively dangerous persons"); Heller, 554 U.S. at 625 n.25 (distinguishing Lewis).

Therefore, the rights of those who have been committed to a mental institution are not addressed by Bruen, and regulations restricting those peoples' ability to possess firearms are presumably lawful.  Applied here, Section 922's "statutory restrictions of firearm possession, such as § 922(g)(1)" and § 922(g)(4), regulate "certain classes of people" whom Congress deemed insufficiently responsible to possess a firearm.  Rozier, 598 F.3d at 771; (see also supra note 14.)

Accordingly, 18 U.S.C. § 922(g)(4) is constitutional on its face under Eleventh Circuit precedent.  Mr. Weathers has failed to demonstrate that no circumstances could exist that would show otherwise, and his Motion should be denied as to Count I of the indictment.

### b.  Is the Law Consistent with Historical Understanding?

To the extent <u>Rozier</u> and <u>McIlwain</u> do not resolve defendant's Second Amendment challenge, Section 922(g)(4) is constitutional under <u>Bruen</u>.  The Government assumes for the sake of argument that defendant's conduct is covered by the Second Amendment under the first step of the analysis, and so will the undersigned.  (Gov't Resp. 5-6; <u>supra</u> note 11.)  On the second step, the Government offers several grounds in arguing that Section 922(g)(4) is consistent with the Nation's historical understanding of the scope of the right to bear arms.

First, the Government points to <u>Heller</u>'s recognition of longstanding measures regulating firearm possession for the mentally ill.  It is true that such regulations presumably do not offend the Second Amendment, but that legal observation makes the <u>Bruen</u> analysis unnecessary.  (<u>Supra</u> Part II.B.1.a.)  And while that recognition by the Supreme Court provides an answer to <u>Bruen</u>'s

49

overarching historical question,[15] it is "not . . . [itself a] historical analysis." <u>Heller</u>,

554 U.S. at 626.

Defendant argues that some courts which considered the issue have found

no evidence of a historical tradition of disarming the mentally ill.  (Def.'s Reply 29

(citing <u>United States v. Rose</u>, 1:23-CR-00034-HAP-SLC (N.D. Ind. Dec. 20,

2023); <u>Tyler v. Hillsdale Cnty. Sheriff's Dep't</u>, 837 F.3d 678, 689 (6th Cir. 2016)).)

As such, Mr. Weathers claims that the Government cannot show a "'distinctly

---

[15] In light of <u>Rozier</u> and <u>McIlwain</u>, further discussion of this aspect of <u>Heller</u> is unnecessary.  However, courts outside of this Circuit have applied <u>Heller</u>'s statement concerning the mentally ill and its review of historical tradition more generally under the <u>Bruen</u> framework to reach similar conclusions.  For example, like <u>Rozier</u>'s discussion of qualified individuals, the Southern District of West Virginia found that:

> When the *Heller* Court interpreted the Second Amendment, it reviewed history and tradition from England, the colonial and founding periods, and the nineteenth century to determine how that history and tradition informed or reflected the founding-era understanding of the Second Amendment.  Examining these same kinds of sources to identify the historical justification for § 922(g)(4) reveals one controlling principle that applies to each historical period: dangerous persons could be disarmed.  Accordingly, because there is a historical basis for disarming individuals that have been determined to be dangerous to themselves and/or the public at large, § 922(g)(4) is constitutional on its face.

<u>Gould</u>, 2023 WL 3295597, at *13.

similar' disarmament tradition under *Bruen*." (Id. at 30.)  But that is not the Government's position, nor is it the objective of Section 922(g)(4).

The Government acknowledges that laws "specifically excluding the mentally ill from firearm possession . . . were not necessary during the eighteenth century." (Gov't Resp. 8-9 (quoting Beers v. Att'y Gen. United States, 927 F.3d 150, 157-58 (3d Cir. 2019), judgment vacated sub nom., Beers v. Barr, 140 S. Ct. 2758 (2020)).)  At the time, judicial officers simply detained or committed individuals considered to pose a public danger due to their mental impairments. See Beers, 927 F.3d at 157-58.  Thus, even if Bruen's "distinctly similar" language would impose a heightened standard in some cases, Bruen clearly anticipates reasoning by analogy to relatively similar regulations here.  597 U.S. at 28-30; but see Gould, 2023 WL 3295597, at *9 (finding that "*Bruen* does not *require* a 'distinctly similar' historical regulation," but offers "several examples to guide courts," including this "example of 'relevant evidence.'") (citations omitted). Indeed, Bruen itself looked for analogous regulations to the New York scheme throughout its analysis.  See, e.g., 597 U.S. at 53-55 (concluding that although antebellum state court decisions restricted concealed carry, they allowed open carry for self-defense, and thus bore little resemblance to New York's outright ban).

51

Continuing its analogy, the Government reasons that because eighteenth century courts found taking such peoples' physical liberty permissible, those courts understood the "lesser intrusion" of taking their firearms to be entirely appropriate. (Gov't Resp. 8-9 (citing Beers, 927 F.3d at 157-58; Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 13773-78 (2009); Jefferies v. Sessions, 278 F. Supp. 3d 831, 841 (E.D. Pa. 2017); Keyes v. Lynch, 195 F. Supp. 3d 702, 718 (M.D. Pa. 2016)).)[16]  And while defendant suggests this is an improper means-end inquiry, the Government discusses detention and commitment to show that founding-era laws "would have justified restricting the right" of the mentally ill to possess firearms, which would clearly be the case under such circumstances. Bruen, 597 U.S. at 46.

---

[16] Defendant is correct that "*Beers* is not good law," considering the Supreme Court vacated the decision as moot.  (Def.'s Reply 28.)  However, the Government offers Beers for its historical analysis and gathered references, not for its holding or applied legal standards.  The same goes for the other pre-Bruen cases cited by the Government (and the undersigned) that applied the now-outdated Second Amendment framework but nevertheless discussed historical evidence as directed by Heller.  See Bruen, 597 U.S. at 19 ("Despite the popularity of this two-step approach, it is one step too many.  Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history.")

The Government next points to Pennsylvania's 1787 "Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents," a "highly influential" precursor to the Second Amendment. <u>Heller</u>, 554 U.S. at 604.[17]  According to the Address, persons who "were a real danger of public injury" could not possess firearms. <u>Beers</u>, 927 F.3d at 158.  The mentally ill fit this category not for its own sake, but for the historical belief that, like children, they were not sufficiently responsible to be armed without posing a public danger.  <u>See, e.g.</u>, <u>Mai</u>, 952 F.3d at 1114 (observing that "historical evidence supports the view that society did not entrust the mentally ill with the responsibility of bearing arms"); <u>United States v. Skoien</u>, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (discussing the Address, noting that limitations on the gun rights of people perceived as dangerous "was understood in the eighteenth century even when not stated expressly in the constitutional text") (citing Stephen P. Halbrook, *The Founders' Second Amendment* 273 (2008)); <u>Bena</u>, 664 F.3d at 1183-84

---

[17] Defendant is also correct that the Nation ultimately rejected the Pennsylvania proposal.  (Def.'s Reply 30 n.7 (citing <u>Heller</u>, 554 U.S. at 658 (Stevens, J., dissenting).)  But this does not diminish the historical understanding of its contents, and <u>Heller</u>'s majority recognized its influence regardless of this point.  554 U.S. at 604-05 (majority rejecting Justice Stevens's proposition "that different people of the founding period had vastly different conceptions of the right to keep and bear arms").

("Scholarship suggests historical support for a common-law tradition that permits restrictions directed at citizens who are not . . . responsible.  The [Heller] Court's discussion is consistent with the view" that at common law, "the right to arms does not preclude laws disarming . . . children or the mentally unbalanced.") (citing the Address, among other materials).

These historical regulations addressed the societal issue of "disarming individuals that have been determined to be dangerous to themselves and/or the public at large." Gould, 2023 WL 3295597, at *13.  And in addressing that issue, the founding generation believed the mentally ill would be potentially dangerous if armed with a weapon, as well as children, based upon the perception that they were not as responsible as the general citizenry.  Id.; see also Bena, 664 F.3d at 1183 ("In the 1760s, Blackstone explained that English subjects enjoyed a right to have arms for their defense, 'suitable to their condition and degree' and 'under due restrictions.'") (quoting 1 William Blackstone, *Commentaries* *139).

Likewise, "the societal problem § 922(g)(4) seeks to address is firearm violence by individuals who have been determined to be a danger to themselves or others," and not necessarily "firearm violence by those who simply have any kind of mental illness."  Gould, 2023 WL 3295597, at *12.  Rather than a broad

54

prohibition on the mentally ill, Section 922(g)(4) prohibits firearm possession by two groups of people Congress found insufficiently responsible to possess firearms without posing a danger to themselves or their communities:  (1) those who have been "adjudicated as a mental defective," and (2) those who have "been committed to a mental institution," perhaps due to a mental illness, or "for other reasons."  18 U.S.C. § 922(g)(4); 27 C.F.R. § 478.11 (including "commitment to a mental institution involuntarily," "commitment for mental defectiveness or mental illness," or "for other reasons, such as for drug use"); (see also supra note 13); 114 Cong. Rec. 21,829 (1968) (Congress expressing the purpose of Section 922(g)(4) to "cut down or eliminate firearms deaths caused by persons who are not criminals, but who commit sudden, unpremeditated crimes with firearms as a result of mental disturbances"); Barrett, 423 U.S. at 218 (noting Section "922(g)" applies to certain "categories of potentially irresponsible persons").

Just as the Nation historically enacted restrictive measures in accordance with the view that minors and the mentally ill were insufficiently responsible to possess firearms without posing a public danger, Section 922 provides for an analogous measure in restricting those who have been committed to a mental institution from possessing a firearm.  See Bruen, 597 U.S. at 73 (Alito, J.,

concurring) (reiterating that the holding did not question such measures and discussing this objective of Section 922 as it pertained to minors, clearly implying such restrictions are constitutional); <u>id.</u> at 31-32 (majority referring to petitioners as "<u>ordinary</u>, law-abiding, <u>adult</u> citizens") (emphasis added); <u>id.</u> at 79-81 (Kavanaugh, J., concurring) (making similar points).

Mr. Weathers criticizes the Government's reliance on archaic treatment of the mentally ill at the time of the Second Amendment's adoption, including "the tradition of locking up 'lunatics.'"  (Def.'s Reply 29 (referring to the historical review in <u>Beers</u>, 927 F.3d at 157).)  The founding generation's treatment of the mentally ill may very well be objectionable today.  But that is not the issue here. <u>Bruen</u> does not direct the Court to ask whether 18th century lawmakers were right in their perceptions of this group, nor does it ask whether Section 922(g)(4) strikes an appropriate balance in addressing public safety concerns.  597 U.S. at 29 n.7 ("This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry.  Again, the Second Amendment is the 'product of an interest balancing *by the people*,' not the evolving product of federal judges.") (quoting <u>Heller</u>, 554 U.S. at 635).  Instead, <u>Bruen</u> requires the Government to show that the law is consistent with the historical understanding of

56

the right to bear arms.  Id. at 27.  And the Government has met this burden by demonstrating that the people of the founding generation struck a balance in regulating firearm possession that is comparable to that of Section 922(g)(4).  Id. at 29-30.  Specifically, the Government has presented a historical understanding that people who have been determined to be a danger to themselves or the public were not considered sufficiently responsible to be armed, and that this included the mentally ill, among others.  The Government has also identified historical measures that precluded those groups from possessing firearms.  Section 922(g)(4) conforms to this understanding of the right to bear arms, and is therefore consistent with the Nation's historical tradition of firearm regulation.

Accordingly, the undersigned **REPORTS** that Section 922(g)(4) is constitutional on its face, and **RECOMMENDS** that defendant's Motion be **DENIED** as to Count I of the indictment.

### 2.  Section 922(n)

Section 922(n) makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(n).  To the extent that Rozier does not control

the treatment of this provision of Section 922,[18] the Government contends that the statute is constitutional under <u>Bruen</u>.  Like its previous argument, the Government assumes the charged conduct meets the constitutional text, but claims that Section 922(n) is consistent with the Nation's historical tradition.  The Government offers three historical measures it claims are analogous to Section 922(n).

First, the Government argues that the public safety threat posed by armed people released on bond for felony offenses was not a general societal problem for the founding generation because such persons would have remained detained, or worse.  (<u>See</u> Gov't Resp. 10 ("At the founding, '[c]apital punishment for felonies was ubiquitous' and 'was the standard penalty for all serious crimes.'") (quoting <u>Medina v. Whitaker</u>, 913 F.3d 152, 158 (D.C. Cir. 2019)).)  The First Congress cared little about the proportionality of capital crimes, as with colonial New England, encompassing both violent and nonviolent offenses considered felonies

---

[18] Similar to <u>Rozier</u> and <u>McIlwain</u>'s treatment of Sections 922(g)(1) and 922(g)(4), courts in this District have also applied <u>Heller</u> to Section 922(n) to find it constitutional.  <u>See, e.g.</u>, <u>United States v. Thomas</u>, No. 1:18-CR-141-MLB-AJB, 2021 WL 3674123, at *18 (N.D. Ga. May 17, 2021) ("[T]he Court has been directed to no case that holds § 922(n) violative of the Second Amendment in light of *Heller* and, in fact, all of the cases that have considered the issue have found that § 922(n)'s proscription survives *Heller*.") (citations omitted), <u>R. & R. adopted</u>, 2021 WL 2886015 (N.D. Ga. July 9, 2021).  Although this was before <u>Bruen</u>, that case did not disturb <u>Heller</u> or <u>Rozier</u>.  (<u>See</u> <u>supra</u> Part II.B.1.a.)

today.   (Id. (citing Medina, 913 F.3d at 158 (e.g., "counterfeiting currency, embezzlement, and desertion"); Harmelin v. Michigan, 501 U.S. 957, 980-81 (1991) (opinion of Scalia, J.); Furman v. Georgia, 408 U.S. 238, 335 (1972) (Marshall, J., concurring)).)   Given the wide range of capitol offenses, the Government argues, those charged with what we would call a felony "were excluded from bail and detained."   (Id. at 10-11 (citing Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490, 502 (2018); United States v. Slye, No. 1:22- mj-144, 2022 WL 9728732, at *2 (W.D. Pa. Oct. 6, 2022); United States v. Rowson, 652 F. Supp. 3d 436, 470 (S.D.N.Y. 2023)).)

In addition to the Government's references, the Supreme Court has recognized that from the English Bill of Rights to our own, state and local governments have traditionally exercised their powers to detain those accused of serious crimes before trial, "whether violent [or] not." United States v. Alston, No. 523CR00021FLRN1, 2023 WL 4758734, at *9 (E.D.N.C. July 18, 2023) (citing Carlson v. Landon, 342 U.S. 524, 545-46 (1952); 4 William Blackstone, *Commentaries on the Laws of England* 94, 98-99, 101 (Cooley ed. 1871)), R. & R. adopted, 2023 WL 7003235 (E.D.N.C. Oct. 24, 2023); see also id. at *10 (noting upon reviewing similar evidence that "[h]istory from both England and the

founding era establish the government's authority to immediately and totally deprive someone under felony indictment of their liberty pending trial").

Because the problem of armed violence perpetrated by released indictees of serious offenses was not prevalent in the 18th century, the Government analogizes the historical balance struck for pretrial detention with Section 922(n)'s firearm restriction.  See Bruen, 597 U.S. at 28-29; see also United States v. Jackson, 661 F. Supp. 3d 392, 409 (D. Md. 2023) (noting, "to my knowledge, all of the district court decisions pertaining to § 922(n) have considered historical analogies") (citations omitted). [19]   The Government reasons that because 18th century lawmakers found it justified to keep those under serious charges detained for both violent and nonviolent offense, they also understood disarming them to be justified and legal.  See Bruen, 597 U.S. at 46.

---

[19] The undersigned rejects defendant's argument that the Government must identify a "distinctly similar" regulation for the reasons set forth supra Part II.B.1.b. See also Fabiano, 2023 WL 9597783, at *6 (finding it proper for the government to identify "founding era firearms restrictions that are analogous, i.e., 'relevantly similar'" to Section 922(n)).  The undersigned also acknowledges that Mr. Weathers points to Pennsylvania and New York laws that removed capitol penalties from several offenses and allowed for bail in some cases, but finds that this does not render Section 922(n) unconstitutional for the reasons set forth supra note 17.

Similarly, Congress expanded Section 922's firearm restrictions in 1961 "to include persons indicted on any felony, both violent and non-violent," in an effort to "make it more difficult for the criminal elements of our society to obtain firearms." Fabiano, 2023 WL 9597783, at *4 (citing Adger, 2023 WL 3229933, at *2; Alston, 2023 WL 4758734, at *8; S. Rep. No. 364, 87th Cong., 1st Sess. 2 (1961)).  Compared to the historical burdens associated with detention, Section 922(n) does not take one's freedom of self-defense entirely by confinement, nor does it prevent possession of a firearm if the person received it before being indicted.  "At worst, § 922(n) imposes an equal burden on a defendant's right to armed self-defense when compared to pretrial detention." Alston, 2023 WL 4758734, at *10.  Moreover, the historical practice of pretrial detention and Section 922(n) derive from the same justification:  "[A] grand jury's formal accusation that there is probable cause to believe the defendant committed a serious crime." Id.

From the 18th century to the 21st, an indictment "may do more than commence a criminal proceeding," but also provide the state lawful grounds to "immediately depriv[e] the accused of her freedom." Kaley v. United States, 571 U.S. 320, 329 (2014).  For those not already in custody, an indictment can deprive one's physical freedom by arrest or one's Fourth Amendment rights in the absence

61

of a warrant.  Id.  And by initiating a criminal proceeding, an indictment also threatens "economic, reputation[al], and personal harm."  Id.  Here, the inability to ship, transport, or receive a firearm is one such deprivation that is consistent with the historical understanding of the limited rights of pretrial detainees.  See Alston, 2023 WL 4758734, at *10 (finding Section 922(n) "analogues enough" to historical pretrial detention "to pass constitutional muster") (quoting Bruen, 597 U.S. at 30).

Second, the Government argues the law is consistent with founding-era regulations that disarmed certain groups of people perceived to pose a threat to public safety.  The Government again relies upon the Pennsylvania Address, which provided that citizens generally had a personal right to bear arms "unless for crimes committed or real danger of public injury."  Skoien, 614 F.3d at 640 (quoting Bernard Schwarz, 2 *The Bill of Rights: A Documentary History* 662, 665 (1971)). This not only expressed public safety concerns for those who have been convicted of crimes, but also those whom the people perceived to pose "heightened risks of criminality or dangerousness."  Adger, 2023 WL 3229933, at *4.  As discussed above, the founding generation believed those who have been accused of a serious crime were among the groups they considered to be potentially dangerous.  Those

people remained detained under this perception until trial, which precluded their ability to bear arms.[20]  See Alston, 2023 WL 4758734, at *9-10.

Like those who have been committed to mental institutions, "§ 922(n)'s prohibition on persons under indictment from acquiring a firearm 'is underpinned by the same considerations as felons in possession:  each stand for the principle that unvirtuous persons [may] be disarmed (in this case, temporarily), while the case is pending." United States v. Evenson, No. CR-23-24-BLG-SPW, 2023 WL 3947828, at *2 (D. Mont. June 12, 2023) (citation omitted); (see also supra Part II.B.1.b.)  Congress enacted Section 922(n) out of "fear of threats or violence among the community" by those facing serious charges. Rowson, 652 F. Supp. 3d

---

[20] Along these lines, the Government also points to other groups the founding generation deemed insufficiently responsible to bear arms due to their perceived threat of danger.  For example, the Government offers measures to disarm those who refused to take oaths to the state, Native Americans, slaves, and those going armed offensively.  (See Gov't Resp. 11-14 (citing Acts and Resolves of the Province of the Massachusetts Bay 52-53 (1869) (1692 statute), Gov't App. at 4-5; Acts and Laws of His Majesty's Province of New-Hampshire: In New-England with Sundry Acts of Parliament 17 (1771) (1701 statute), Gov't App. at 17; 1 Laws of the State of North-Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131–32 (1821) (1741 statute), Gov't App. at 25-26; Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) (1786 statute), Gov't App. at 33; Robert H. Churchill, *Gun Regul., the Police Power, & the Right to Keep Arms in Early Am.: The Legal Context of the Second Amend.*, 25 Law & Hist. Rev. 139, 15760 (2007).)

at 470 (citations omitted).   Congress believed those people to be potentially dangerous because, when an indictment "establishes probable cause to believe a person has committed a felony offense, there is sufficient cause to fear the illegal use of a firearm if, while the charge is pending, the accused person ships, transports, or receives a firearm in interstate commerce."  Adger, 2023 WL 3229933, at *4.

Mr. Weathers objects to both the historical and modern assumption that those who are charged with a serious offense are potentially dangerous, and urges the Court not to consider such "subjective assessment[s] of . . . 'trustworthiness'" or "archaic and discriminatory notions."  (Def.'s Reply 23.)  Again, though, Bruen instructs courts not to weigh into such matters, making clear that whether the founding generation or modern lawmakers are right in their assumptions is not part of the analysis.  597 U.S. at 29 n.7.  In light of the above, Section 922(n) comports with historical understanding and strikes a similar balance in disarming those that are perceived to pose a heightened risk of danger to the community.

Finally, the Government argues that Section 922(n) is relatively similar to surety laws at the time of the founding.  In England, "surety laws required a person 'reasonably accused of posing a threat' to post a bond to cover any damage he might cause by carrying a gun."  (Gov't Resp. 14 (quoting Wrenn v. District of

<u>Columbia</u>, 864 F.3d 650, 661 (D.C. Cir. 2017)).)   The Government points to Blackstone's *Commentaries*, which provided that if a private citizen had "just cause to fear, that another will burn his house, or do him a corporal injury, by killing, imprisoning, or beating him," he could "demand surety of the peace against such person."   4 William Blackstone, *Commentaries on the Laws of England* 252 (1769)).)   Although surety could result in detention or damages against the one upon whom it is levied, it was "intended merely for prevention, without any crime actually committed by the party, but arising only from a probable suspicion, that some crime [was] intended or likely to happen."   <u>Id.</u> at 249.   In addition to this common law understanding, the Government provides ample support for this practice's prevalence in early-American legislation.[21]

_____

[21] <u>See, e.g.</u>, Acts and Laws of His Majesty's Province of New-Hampshire in New-England with Sundry Acts of Parliament 2 (1761) (allowing for the arrest of a person who went armed in a threatening manner, allowing commitment until surety of peace and good behavior was provided, and allowing "the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold" upon violation); Acts and Resolves of the Province of the Massachusetts Bay 52–53 (1869) (1692 statute), Gov't App. at 4-5; 2 Statutes at Large of Pennsylvania from 1682 to 1801, 23 (1896) (1700 statute), Gov't App. at 13; 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven 52 (1797) (1700 statute), Gov't App. at 9; Acts and Laws of His Majesty's Province of New-Hampshire in New-England with Sundry Acts of Parliament 17 (1771) (1701 statute), Gov't App. at 17; Acts and Laws of His Majesties Colony of

The Southern District of Georgia considered this analogy in <u>Adger</u>, and concluded that while <u>Bruen</u> found surety laws largely unrelated to the proper-cause requirement for all New Yorkers, "[t]he similarity to § 922(n) is obvious." 2023 WL 3229933, at *4; <u>see also</u> <u>United States v. Smith</u>, No. CR 122-081, 2023 WL 3012007, at *4 (S.D. Ga. Mar. 29, 2023) (finding the same), <u>R. & R. adopted</u>, 2023 WL 3010178 (S.D. Ga. Apr. 19, 2023). In this District, United States Magistrate Judge Clay Fuller described the analogy as follows:

> [T]he surety laws—like § 922(n), but unlike the New York 'proper cause' law at issue in *Bruen*—presume that individuals have the right to bear arms, and imprisoned or otherwise restricted only those persons who had disturbed the peace or whose public possession of a firearm, as determined by a justice of the peace or other legal process, was otherwise likely to spread fear among the public. Similarly, § 922(n) applies only to a subset of persons—felony indictees—as to whom probable cause has been found, by a grand jury or its prosecutorial equivalent in the context of a consented-to felony information, to have committed a serious crime. And they impose a burden with respect to the firearms that is comparable or, arguably, less than the surety laws.

<u>Fabiano</u>, 2023 WL 9597783, at *8 (internal quotations and citations omitted) (discussing the court's analysis in <u>Rowson</u>, 652 F. Supp. 3d at 465-72, agreeing with <u>Rowson</u>, <u>Adger</u>, and <u>Smith</u>); <u>see also</u> <u>Adger</u>, 2023 WL 3229933, at *4 n.3

---

Connecticut in New-England: Printed in 1702 and Now First Reissued 91 (1901) (1702 statute), Gov't App. at 20.

(gathering cases that found Section 922(n) sufficiently analogous to surety laws to pass constitutional muster). United States District Judge Richard Story agreed with that analysis, <u>Fabiano</u>, 2024 WL 196480, at *2, and so does the undersigned. Therefore, the Government has shown that Section 922(n) is analogous to historical measures of holding serious offenders detained until trial, disarming potentially dangerous groups of people, and surety regulations.

The undersigned acknowledges that Mr. Weathers points to some district courts that disagree that these historical measures are sufficiently analogous to Section 922(n). (Def.'s Reply 26-27.) And the undersigned acknowledges that there are other cases Mr. Weathers does not cite that have reached that conclusion, finding Section 922(n) unconstitutional under <u>Bruen</u>. However, none of those cases are binding on this Court and Section 922(n) is constitutional for the reasons stated above. As Judge Fuller pointed out, those cases are among split authority in their respective circuits and reflect the minority position. <u>See Fabiano</u>, 2023 WL 9597783, at *9-10. In this case, the Government has satisfied its burden of showing that Section 922(n) is consistent with the Nation's historical understanding of the right to bear arms and traditional regulations restricting that right.

67

Accordingly, the undersigned **REPORTS** that Section 922(n) is constitutional on its face, and **RECOMMENDS** that defendant's Motion be **DENIED** as to Count II of the indictment.

### III.   CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Dismiss Indictment [15] be **DENIED** in its entirety.

**SO RECOMMENDED**, this 11th day of March, 2024.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE